SIMMONS *v.* STATE.

In Banc. Mar. 13, 1950.

No. 37387 (45 So. (2d) 149)

B. P. Mauldin and F. F. Wicker, for appellant.

**George H. Ethridge,** Acting Attorney General, for appellee.

**Lee, J.**

Appellant, J. A. Simmons, Jr., was indicted and tried for the murder of his mother, Mrs. Alma W. Simmons. The jury found him guilty as charged, but disagreed as to the punishment. As provided in such cases, he was sen-

tenced to serve a term of his natural life in the State Penitentiary.

His appeal complains of error by the lower court (1) in failing to deliver to one of his named counsel a copy of the indictment and returns on the special venire a full day before the trial; (2) in refusing to grant a peremptory instruction for his acquittal; and (3) in overruling his motion for a new trial.

On the first question, the evidence was as follows: On Monday his case was set for trial on the following Wednesday. By proper motion, he complied with Section 2505, Code of 1942, for a special venire, and asked that a copy of the return be delivered to one of his named counsel. The court ordered the special venire, but directed that the copy of the return be delivered to the defendant or his counsel. The delivery was made to the defendant in jail Monday prior to midnight. ██ No copy of the indictment was delivered at the time. But the statement by the trial judge shows that this requirement was waived, and great weight must be given to such a statement. Gurley v. State, 101 Miss. 190, 57 So. 565. Besides, the statement was not even controverted. Of course, such right may be waived; and there was no error in this respect.

██ Since the statute, Section 2505, Code of 1942, provides for the delivery of a copy of the return to the *defendant or his counsel*, it was not error to deliver it to him, even though request had been made for its delivery to one of his lawyers. Oftentimes the accused, in such cases, is in jail and readily available, whereas counsel, in some cases, might be difficult to locate. And it may be assumed that counsel will promptly contact their clients about such important matters.

On the second question, appellant takes the position that his request for a peremptory instruction to the jury to find him not guilty should have been given, because he was the only witness, and his version of the killing— that it was accidental—was reasonable. He contends

that it falls within the rule that where the accused is the only witness, and his version is reasonable, and is not contradicted by a credible witness, or by the physical facts, or facts of common knowledge, such version must be accepted as true. He calls attention to Hunt v. State, 108 Miss. 588, 67 So. 57; Weathersby v. State, 165 Miss. 207, 147 So. 481; Done v. State, 202 Miss. 418, 32 So. (2d) 206; Westbrook v. State, 202 Miss. 426, 32 So. (2d) 251, and other cases.

To be true, the above stated rule is recognized beyond question in our jurisprudence. It is the guide in the interpretation of the facts of a particular case. Consequently a summary of the evidence is necessary to determine whether or not appellant's version of the killing comes within this rule.

J. E. Simmons, Sr. and his wife, Alma W. Simmons, lived together on their farm in Pontotoc County. They were seventy-three and sixty-six years of age, respectively. Their son, J. A. Simmons, Jr., appellant, with his family, had lived in the home with them for several months, but had moved into another house on the place the day before the tragedy. Early in the morning on the 7th day of April 1948, the father had gone to milk, leaving his wife alone in the house. He had driven up, and milked, two cows, and was coming in the back screen door when a gun fired. At the back door he met his son, appellant, who had a single barrel shotgun in his hand. He told his father to go into the house and see what had happened. He said that his mother was dead and he had killed her. He was pointing the gun in his side and said he was trying to shoot himself. The father went into the room, and saw two chairs had been knocked down. His wife was sitting in a rocking chair, as though she had sat down, and was dead. Nobody was in the house but his wife and son. Thereupon, the father lost consciousness for some time.

An examination of the body by a doctor about nine o'clock that morning disclosed the following situation:

The right temple and part of the frontal bone were shot away. Mrs. Simmons was sitting in a chair and had been dead perhaps four hours. She was slumped in the chair, leaning slightly to the right, with her right arm touching the floor, with her left leg extended, and her right knee flexed, with the foot under her. Her left hand was in her lap. The path of the wound was downward. Death had been caused by shotgun wounds. There were no powder burns. Behind her and to the left about three feet was a window. Curtains on the window had blood and tissue on them, in the same line, and some three to five inches lower than the head. The doctor expressed the opinion that the gun was about four feet away, and that Mrs. Simmons was incapable of making any movement under her own power after being shot. Several witnesses agreed upon these physical facts, and pointed out further that the door was in the west side of the room, and beds were on each side. A cup and saucer were nearby as though she had been drinking coffee.

A coroner's inquest was held. The appellant was not under arrest at the time. He stated to the inquest that he knew nothing about the killing of his mother whatever; that he was in the dining room when he heard the shot; that after the shot, he went into the room, and found his mother in the rocking chair dead; that no one else was in the house at the time; and that the shotgun was on the floor at his mother's side. Witnesses observing the appellant at the inquest thought there was little difference between him then and at other times, though he seemed to be in an angry spirit, talked somewhat stubbornly, and cut them short when he was being questioned. He maintained the same version of the killing in a number of conversations with the sheriff and other officers over a period of a month to a month and a half. During all of that time, he disclaimed any connection whatever with the death of his mother.

Besides, the father testified that appellant was the baby—his mother was partial to, and foolish about, him—

and they fussed and quarreled at times. When he asked her for money and she refused, he would become angry. Several times a neighbor had heard him cursing her, and heard his mother talking to him. A brother said he was mean toward his mother, mistreated her, and tried to run over her, especially when he was drinking.

Appellant, for himself, at the trial, testified that he. had gone frog gigging the night before and was going fishing that day. He went to his father's house that morning about seven-thirty to get his baby's thermos bottle, a bottle of Karo, and his fish hooks. His mother helped to get these articles. He wanted to carry a gun to kill a rabbit for bait, and while he had a gun himself, he had only one shell, and he did not want to lay his gun on the creek bank. He picked up the single barrel shotgun behind his mother, but was unaware that it was loaded. He was pranking with it, had it cocked, and was probing with a file, when it went off. He laid it down, ran to the back door, and told his father to go and see what had happened. He claimed that he had no ill feeling against his mother, but on the contrary, she meant more to him than anybody in the world. He made a demonstration before the jury, which they saw.

Appellant further testified that he was in the military service for two and one-half years, had an honorable discharge, and had never been convicted of a crime. He claimed to have been in a jeep wreck that affected his nerves, for which he took medicine, not dope. On cross-examination, his explanation of his statement at the coroner's inquest was that he had not seen a lawyer, and was, therefore, putting it off until such time as he might have counsel. At first, he denied that he told the officers that he was in the dining room at the time of the shooting, and that he told the coroner's jury that he did not know who killed his mother. Likewise, he denied the other statements to the officers about his being in the dining room or kitchen when the shot was fired. However, he finally admitted that he might have made these state-

ments, and gave, as an excuse for what he said to the officers, that they were threatening to send him to Chicago before a lie detector. His final reason, however, for waiting so long to change his version was that he was without the assistance of counsel, and, when lawyers were appointed, he promptly told them the whole truth.

It is seen, therefore, that there is a serious conflict between his story, as related from the witness stand, and the one originally told and reiterated. In this situation, there are some outstanding facts and deductions: (1) He was fretful and mean toward his mother—fussed and quarrelled with her—and when she refused to give him money, he became angry. This was proof of motive. (2) He knew it was a tricky gun, but he said he pranked with it in his mother's face. (3) When he told his father to go in the room and see what had happened—that he had killed his mother—he offered no explanation that it was an accident. He related no details. This conduct was unnatural and unreasonable for, if an accident, he should, and doubtless would, have so told his father, and given the details. (4) At the inquest, he denied that he was in the room—said he was in the dining room or kitchen, and did not know how it happened. (5) For a month to a month and a half, he claimed that he was totally ignorant about how his mother was killed. Innocence was a long time asserting itself. (6) On the stand, under cross-examination, at first he even denied making the statements at the inquest and to the officers. (7) He said that he did not tell the truth until after he secured lawyers.

In Hunt v. State, supra, the husband, after the shooting, immediately gave the alarm, and said that his wife had shot herself; that she was drunk or drug crazed, quarreled with him, got the gun, was trying to shoot him, and he was trying to take the weapon away from her, when it fell to the floor and was discharged.

In Done v. State, supra, where the husband claimed that the shooting was accidental, he took his wife to the hospital, and she was conscious for thirty or forty min-

utes. During that time she never made any accusation against her husband. The Court said that this was hardly the action of a guilty man, because if she recovered, she would be a witness against him, and in the face of impending death, she could have made a dying declaration.

The other cases cited are of little value in this case.

The killing of a mother by her son is so unnatural and revolting that the average person is receptive toward any reasonable theory which negatives an intentional killing. We have given much study and thought to the evidence in this record. We are constrained to believe that the original triers of the facts must have been of like mind. Suffice it all to say, under the evidence in this case, whether the death of this unfortunate woman was murder or the result of an accident was for the jury, and the guilt or innocence of the appellant was for their determination.

We are of the opinion that the evidence was sufficient to warrant a finding by the jury, beyond reasonable doubt, that the appellant murdered his mother.

Thus, it was not error to submit the case to the jury; and the motion for a new trial was properly overruled.

Affirmed.